IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | 8:06CR4 |
| ) | |
| vs. ) | REPORT AND |
| ) | RECOMMENDATION |
| MARVIN F. BAKER, ) | |
| ) | |
| Defendant. ) | |

This matter is before the Court on the motion to suppress by defendant Marvin F. Baker (Baker) (Filing No. 11). Baker is charged in the Indictment with two counts of a violation of 18 U.S.C. § 922(g), i.e., possession of a firearm after having been convicted of a felony. Count I relates to a November 10, 2005 possession and Count II relates to a December 25, 2005 possession. Count III charges a violation of 18 U.S.C. § 922(k), i.e., the December 25, 2005 possession of a firearm with an erased or obliterated serial number. Baker seeks to suppress all evidence and statements obtained following an encounter with police on November 10, 2005, and a traffic stop of an automobile in which Baker was an occupant on December 25, 2005, in Omaha, Nebraska.

The Court held an evidentiary hearing for the motion to suppress on March 28, 2006. Baker was present at the hearing along with his counsel, Federal Public Defender David R. Stickman. The government was represented by Assistant U.S. Attorney Douglas R. Semisch. At the hearing, the Court heard the testimony of Omaha Police Department (OPD) Officers Jason Julian (Officer Julian) and Kara J. Hindman (Officer Hindman), Carmela Marie Freemont (Freemont), and Chad Salcedo (Salcedo). The Court received into evidence an OPD Rights Advisory Form (Exhibit 1), a videotape of an interview (Exhibit 2) and a transcript of the videotape interview (Exhibit 3). A transcript (TR.) of the evidentiary hearing was prepared and filed in this matter on April 3, 2006 (Filing No. 30). There was no post-hearing briefing.

**FINDINGS OF FACT**

On November 10, 2005, Officers Julian and Hindman were assigned to conduct patrol on the C shift (from 2:00 p.m. to 10:30 p.m.) for the OPD Gang Unit (TR. 4-5; 41). Both officers were in uniform and assigned to the same unmarked patrol vehicle, a Chevrolet Suburban (TR. 5; 43).  During this period of time, the OPD Gang Unit was engaged in an operation called Zero Tolerance (TR. 6).  This operation was to follow up on citizen complaints and reports of gang turf wars to the extent that officers would contact gang members and follow up with them to see if they were having problems and what their activities were (TR. 6).   The Gang Unit would monitor hot spot locations, look for suspicious criminal activity, and identify and document gang members (TR. 40).  The officers are to engage in proactive prevention, including talking with the gang members and providing rides to these individuals to get them out of certain turf areas to prevent them from becoming gang-related victims (TR. 40-41).  At the start of their shift, the officers attended a roll call conducted by their command sergeants who provided the officers bulletins of gang activities, assigned officers to contact various gang members, and provided information on outstanding warrants for gang members (TR. 6). The officers were given color photos of those wanted on warrants or to be contacted (TR. 6).  One of those wanted on an outstanding misdemeanor arrest warrant was Marvin Baker, the defendant (TR. 6-7). Both Officer Julian and Officer Hindman were familiar with Baker due to several police contacts with Baker prior to November 10, 2005 (TR. 7; 42).  Baker was known to be a member of the Indian Nation Klick (INK) street gang (TR. 8).  The INK turf area consists of 24th Street to 30th Street and from Leavenworth Street south to Martha Street in Omaha (TR. 8).  There is an alleged turf war ongoing between INK and another street gang in the INK area (TR. 9).

After roll call, Officers Julian and Hindman went on patrol.  Around 9:45 p.m., on November 10, 2005, while driving southbound down an alley west of 26th and Leavenworth Streets, the officers saw Baker and an unknown male (whom Officer Hindman recognized to be an INK gang member) round the corner and walk northbound in the alley (TR. 9; 44). Officer Hindman told Officer Julian that they should stop Baker and check him for the warrant (TR. 44).  The Suburban's headlights were lit and Baker was clearly visible to the officers (TR. 44).  By the time the police officers stopped the Suburban, Baker and the

other INK member had walked beside the Suburban (TR. 45).  The alley was surrounded by a brick wall on the west side which was painted with graffiti and by abandoned apartments on the east side which made tight quarters in the alley (TR. 44).  Officer Hindman got out of the passenger side of the Suburban and Officer Hindman called out to Baker who was now at the rear of the Suburban saying: 'Hey, Marvin, what's going on (TR. 45)?" Baker replied: "Nothin (TR. 45)".  Officer Hindman asked Baker: "Hey, what are you guys doing (TR. 46)?"  Baker responded: "Just walking (TR. 46)."  Officer Hindman asked Baker: "Do you have anything I need to know about right now (TR. 45)?"  Baker responded by saying: "Yeah, I've got weed (TR. 46)."  Officer Julian patted down Baker and the other person for weapons and found none (TR. 10; 46).  Using her Nextel radio attached to her uniform, Officer Hindman checked with OPD dispatch to see if the warrant for Baker was active (TR. 47-48; 10-12).  Dispatch having replied that Baker's warrant was still active, Officer Julian placed handcuffs on Baker (TR. 12).  Officer Julian then searched Baker's person and found two baggies of marijuana in Baker's right front pants pocket, a plastic baggie with hydrocodone tablets, and thirteen or fourteen .22 caliber bullets in a baggie from Baker's right rear pocket (TR. 12; 48).  When the bullets were found in Baker's pocket, Officer Hindman shook her head at Baker and Baker stated: "I found them in a parking lot, Kara (TR. 49)."

      Since the other male with Baker did not have any wants or warrants for him, he was told he could leave which he did by walking away northbound in the alley (TR. 48).  Baker was placed in the Suburban and transported to Central Police Headquarters (CPH) by Officers Hindman and Julian (TR. 13; 50).  Baker was taken to the detention area in the basement of CPH and he was not **Mirandized** there at CPH or at the scene of the arrest (TR. 50).  While processing Baker in the detention area, Officer Julian telephoned the poison control center to confirm the hydrocodone tablets were in fact hydrocodone (TR. 14).  At the same time Baker was in the detention area, Officer Hindman was completing her paperwork (TR. 53).  After having spoken with poison control, Officer Julian stated aloud to Officer Hindman within earshot of Baker, that Officer Julian would be booking the pills and bullets into the property room (TR. 15).  Baker stated "You know, I found these bullets in the parking lot, they're not mine (TR. 15; 52)."  Thereafter, the booking of Baker

was completed and Baker was placed in detention (TR. 52).  Neither Officer Julian nor Officer Hindman had further contact with Baker that evening (TR. 15; 53).

On December 25, 2005, Officer Hindman was again working the C Shift performing directed patrol for the OPD Gang Unit in the southeast precinct (TR. 53-54).  Directed patrol involves doing proactive work, monitoring hot spots, frequenting areas of suspected gang activity, and similar duties (TR. 54). Officer Hindman was partnered with OPD Officer Chris Duffek, a fellow officer in the gang unit (TR. 54).  The officers were in an unmarked black Chevrolet Impala equipped with emergency lights and sirens (TR. 54).  Around 6:00 p.m., the officers observed a vehicle in the vicinity of 26th and Poppleton Streets which was leaving a high crime area, i.e., an apartment where there had been recent drive-by shootings (TR. 55).  Officer Hindman called OPD dispatch with the license plate number of the vehicle to determine if it were stolen (TR. 55).  Dispatch radioed back that there was no record found for the plates (TR. 55).  The officers followed the vehicle, a two-door red Chevrolet Corsica, for two blocks and also observed a vision obstruction, i.e., items hanging from the rear view mirror (TR. 56).  The police vehicle's emergency lights were activated and the vehicle stopped near 28th and Woolworth Streets (TR. 56).  Officer Hindman, from the driver's seat, and Officer Duffek, from the passenger seat, got out of the police vehicle (TR. 56).  The officers observed three unidentified occupants in the Corsica (TR. 57).

Officer Hindman approached the driver's side of the vehicle and Officer Duffek approached on the passenger side (TR. 57).  Officer Hindman asked the driver, a female named Carmela Freemont (Freemont), for a driver's license (TR. 57).  Officer Hindman noticed that Baker was a rear seat passenger and that another gang member, Chad Salcedo (Salcedo), was a front seat passenger (TR. 58).  Freemont stated she did not have a driver's license and that her license was suspended (TR. 56).  Officer Hindman radioed in a check of the status of Freemont's driving privileges and for a back-up unit to come to the scene (TR. 56; 58).  Within less than a minute, Officer Julian, who was nearby, responded to the scene and parked his police cruiser behind Officer Hindman's and Officer Duffek's police vehicle (TR. 16-17; 58-59).  Dispatch responded that Freemont was a suspended driver (TR. 56).  Officer Hindman directed Freemont to get out of the car and

4

informed Freemont she was under arrest (TR. 58).  Officer Duffek then directed the two passengers to get out of the vehicle (TR. 58).   Freemont was handcuffed and placed in the back seat of Officer Hindman's police vehicle (TR. 59).  Salcedo became agitated and was handcuffed by Officer Julian and placed in Officer Julian's police vehicle (TR. 59). Baker was removed from the vehicle by Officer Duffek who asked Baker if there was anything Officer Baker needed to know about (TR. 59).  Baker said that he, Baker, had a pipe and a knife (TR. 59-60).  Officer Duffek then placed Baker in handcuffs (TR. 60). Officer Duffek then conducted a search of the Corsica (TR. 19).  Officer Duffek emerged from the vehicle with a handgun in his hands (TR. 19-20).  Officer Duffek stated he found the gun under the front passenger seat towards the rear which was near the location where Baker had been seated in the rear passenger seat (TR. 20).  None of the occupants were advised of their *Miranda* rights at the scene nor were any of the occupants interrogated at the scene (TR.  20; 61).  All three occupants were transported to OPD CPH and each were placed in separate fourth floor interview rooms (TR. 21; 61).   Officer Julian interviewed Freemont who was later cited for driving under suspension, no valid registration, and vision obstruction (TR. 22).

Officer Hindman interviewed Baker in one of the interview rooms (TR. 61).  Officer Hindman asked Baker if he needed to use the restroom or needed anything to drink (TR. 61).  Officer Hindman then turned on the audio and video equipment in the interview room (TR. 61).  Officer Hindman then read Baker his *Miranda* rights using an OPD Rights Advisory Form (Exhibit 1; TR. 61-62).  Baker acknowledged his rights, did not ask to have a lawyer present, and expressed a willingness to proceed with the interview (TR. 63-64). The interview started at 7:15 p.m. and lasted until 9:40 p.m. (TR. 65).

Freemont testified that she picked Baker up at the Poppleton Place Apartments earlier in the evening on December 25, 2005 (TR. 93-94).  She was driving the car when the police pulled them over (TR. 95).  Freemont testified that the car was registered to Rebecca Salcedo, Chad Salcedo's sister (TR. 98).  When the officer first came to her driver's window, she asked Freemont for a driver's license and spoke to Baker in the back seat (TR. 96).  The police officer stated: "Marvin, when did you get out (TR. 86)?" Thereafter, the other police officer came to the passenger side of the car and stated the

same thing to Baker (TR. 97). After Freemont was taken to OPD CPH she was interviewed by the female police officer (TR. 99). Freemont stated she overheard two male officers say something to the effect that the prints led back to Baker (TR. 100).

Salcedo testified he was in the car stopped by the police on December 25, 2005 (TR. 109). Salcedo stated the police officers spoke to Baker in the back seat asking how he got out so soon (TR. 112-113). Salcedo stated one officer looked in the car before the gun was found by another officer (TR. 113-114). Salcedo stated he was arrested and taken to CPH (TR. 114). Salcedo was interviewed at CPH and asked about the gun found in the car (TR. 115). He heard later from Freemont that she overheard officers talking about Baker's fingerprints on the gun (TR. 115-116).

## LEGAL ANALYSIS

In his motion to suppress, Baker asserts that the November 10th stop was unreasonable and any statements made by Baker are inadmissible. Baker asserts the December 25th traffic stop was made without probable cause, the search of the vehicle resulting in the finding of the firearm was illegal, and that subsequent statements made by Baker are inadmissible in evidence.

### A. November 10th Arrest

Baker was arrested by Officers Hindman and Julian when they observed him in the alley. Both officers were familiar with Baker and both had information that there was an outstanding arrest warrant for Baker. Officer Hindman even checked with dispatch to make sure the warrant was outstanding before handcuffing Baker. The stop and arrest of Baker on November 10, 2005, was entirely lawful.

### B. November 10th Statement

After the police officers got out of their vehicle, Officer Hindman asked Baker if there was anything she needed to know. Baker responded that he had "weed." Baker was not **Mirandized** at the scene or later at OPD CPH. After Baker was arrested and patted down at the scene, bullets were found in his back pocket. After the bullets were found, Baker

stated that he found them in a parking lot. While being booked at OPD CPH, Officer Julian told Officer Hindman that he was going to book the bullets into the property room. Again, Baker stated that he found the bullets in a parking lot.

When Baker stated he had "weed" in response to Officer Hindman's question about whether there was anything she needed to know, Baker was not yet in custody. Accordingly, no **Miranda** warning was required for Officer Hindman's question to Baker. Baker's statement that he had "weed" was voluntary and is admissible in evidence.

Baker's statements about where he found the bullets is another matter. Clearly, Baker was in custody at the time he made such statements at the scene and at OPD CPH. Questioning includes, "either express questioning or . . . any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the [defendant]." **United States v. Koontz**, 143 F.3d 408, 411 (8th Cir. 1998) (**citing Rhode Island v. Innis**, 446 U.S. 291, 300-01 (1980)). Failure to advise an in-custodial defendant of such rights will render statements inadmissible made by such a defendant as a result of police interrogation. However, on each occasion, Baker's statement was not in response to any interrogation or questioning by any police officer. "**Miranda** does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." **Butzin v. Wood**, 886 F.2d 1016, 1018 (8th Cir. 1989) (quotation omitted). The court finds Baker's statements to have been volunteered and finds such statements to be admissible in evidence.

### C. December 25th Traffic Stop

"[A] police officer who personally observes a traffic violation has probable cause to stop the vehicle." **United States v. $404,905.00 in U.S. Currency**, 182 F.3d 643, 646 (8th Cir. 1999) **citing Pennsylvania v. Mimms**, 434 U.S. 106, 109 (1977)). Additionally, probable cause exists when the totality of circumstances demonstrates that a prudent person would believe that an individual has committed or was committing a crime. **Kuehl v. Burris**, 173 F.3d 646, 650 (8th Cir. 1999). The courts must give law enforcement officers "substantial latitude in interpreting and drawing inferences from factual

circumstances." ***United States v. Washington***, 109 F.3d 459, 465 (8th Cir. 1997).  In this case, Officers Hindman and Duffek observed items hanging from the rear view mirror which constituted a vision obstruction.  Further, after a run of the license plates on the vehicle, dispatch reported back that the plates were not on file.  Both reasons constituted probable cause to stop the vehicle.

 Contemporaneous with a valid traffic stop, a police officer may detain the motorist while completing a number of routine tasks such as computerized checks of the vehicle registration, driver's license and criminal history, and issuing a citation.  ***$404,905.00,*** 182 F.3d at 647; **see also *United States v. Sokolow***, 490 U.S. 1, 7 (1989).  The driver was operating the vehicle without a driver's license as hers had been suspended.  After Officer Hindman verified the suspension through OPD dispatch, Freemont was arrested.  At that time the passengers were told to get out of the car.  "The law is clear that officers may search the passenger compartment of an automobile and examine the contents of any containers found within the passenger compartment when they have made a lawful custodial arrest of the occupant of an automobile."  ***United States v. Williams***, 165 F.3d 1193, 1195 (8th Cir. 1999) (**citing *New York v. Belton***, 453 U.S. 454 (1981)).  Upon the finding of the gun near the rear and under the front passenger seat, a location accessible to Baker, Baker was arrested and taken to OPD CPH.  The discovery of the firearm constituted probable cause to arrest Baker.  ***Michigan v. Summers***, 452 U.S. 692, 700 (1981); ***Henry v. United States***, 361 U.S. 98, 102 (1959).

 Accordingly, the police properly stopped the vehicle in which Baker was a passenger on December 25, 2005, and the police properly arrested Baker when the gun was found during the search conducted incident to the driver's arrest.

### D.  December 25th Interrogation

 The touchstone for the admissibility of a defendant's statements is voluntariness. ***Brown v. Mississippi***, 297 U.S. 278 (1936).  The court must look to the totality of circumstances in determining whether or not the statements were voluntary.  ***Mincey v. Arizona***, 437 U.S. 385 (1978); ***Colorado v. Connelly***, 479 U.S. 157 (1986); ***Schneckloth v. Bustamonte***, 412 U.S. 218 (1973).  In this case, Baker was advised of his constitutional rights pursuant to ***Miranda***.  There is no evidence Baker did not understand the advice of

rights.  Even though Baker was advised of his *Miranda* rights, the court must examine the conduct of the law enforcement officials to determine whether or not there was an overreaching by law enforcement officials amounting to coercive police activity because coercive police conduct will render a confession inadmissible.  **Blackburn v. Alabama**, 361 U.S. 199 (1960).  The court must consider the totality of the circumstances, including the specific interrogation tactics employed, the details of the interrogation, and the characteristics of the accused.  **Schneckloth**, 412 U.S. at 225-26.  Coercive police pressure is a predicate to the finding that the confession is not voluntary and violates the accused's due process rights.  **Connelly**, 479 U.S. at 167.  However, any police questioning has coercive aspects to it simply by reason of the confrontation.  The police officer is part of the law enforcement system that will cause a charge to be made against a suspect.  The questioning by a police officer, while uncomfortable, is not coercive *per se*. See **Oregon v. Mathiason**, 429 U.S. 492, 495 (1977).

The court has reviewed the entire videotape of the interrogations and a transcript of portions of the interrogation.  The court finds no police activity which would be classified as coercive police activity warranting the suppression of Baker's statements made during his interrogation.  The court finds Baker's statements to be voluntary and admissible in evidence.

**IT IS RECOMMENDED TO JUDGE LAURIE SMITH CAMP that:**

Marvin F. Baker's Motion to Suppress (Filing No. 11) be denied.

### ADMONITION

Pursuant to NECrimR 57.3 any objection to this Report and Recommendation shall be filed with the Clerk of the Court within ten (10) days after being served with a copy of this Report and Recommendation.  Failure to timely object may constitute a waiver of any objection.  The brief in support of any objection shall be filed at the time of filing such

objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 19th day of May, 2006.

BY THE COURT:


s/ Thomas D. Thalken
United States Magistrate Judge